**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MILWAUKEE ELECTRIC TOOL CORPORATION, ) | |
| ) | Case No.: 23-cv-4555 |
| Plaintiff, ) | |
| ) | Judge Martha M. Pacold |
| v. ) | |
| ) | |
| THE INDIVIDUALS, CORPORATIONS, LIMITED ) | |
| LIABILITY COMPANIES, PARTNERSHIPS AND ) | |
| UNINCORPORATED ASSOCIATIONS IDENTIFIED ) | |
| ON SCHEDULE A HERETO, ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFF'S REPLY IN SUPPORT OF ENTRY OF A PRELIMINARY INJUNCTION

Plaintiff submits its Reply in Support of Entry of a Preliminary Injunction against Defendant Nos. 48 "sunmily", 122 "APTOOLER", 163 "HiTooler", 178 "LiBatter" and 185 "Mrupoo Brand" (hereinafter "Defendants") and in thereof support states:

## I.    INTRODUCTION

Defendants have been accused of infringing the registered trademarks of MILWAUKEE ELECTRIC TOOL CORPORATION ("Plaintiff" or "MILWAUKEE TOOL") through Defendants' interactive commercial websites on the e-commerce platform of Amazon.com, Inc. ("Amazon"). Plaintiff has satisfied the necessary elements for entry of a Preliminary Injunction and Defendants fail to demonstrate any circumstances which would prevent this Court from entering a preliminary injunction.

## II.    STATEMENT OF FACTS

On July 14, 2023, Plaintiff filed a Complaint against Defendants alleging federal trademark infringement and counterfeiting (Count I), false designation of origin (Count II) and violation of the Illinois Uniform Deceptive Trade Practices Act (Count III).

On July 19, 2023, this Court granted Plaintiff's Motion for a TRO. [Dkt. Nos. 21, 22]. On August 1, 2023, this Court extended the TRO for an additional fourteen (14) days, or until August 16, 2023. [Dkt. No. 25]. On August 11, 2023, Plaintiff filed a Motion for Entry of a Preliminary Injunction Order and supporting Memorandum. [Dkt. Nos. 29, 30].

On August 22, 2023, Defendants filed a Response to Plaintiff's Motion for Entry of a Preliminary Injunction. [Dkt. No. 43]. On August 22, 2023, this Court set a briefing schedule on Plaintiff's Motion for Entry of a Preliminary Injunction whereby Plaintiff's Reply is due September 5, 2023. [Dkt. No. 41]. The deadline for Plaintiff to file its Reply was extended tto September 15, 2023. [Dkt. No. 60].

## III.   STATUTORY AUTHORITY

A party seeking to obtain a preliminary injunction must demonstrate: (1) that its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that it will suffer irreparable harm if the injunction is not granted. *See Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).  If the Court is satisfied that these three conditions have been met, then it must consider the harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Id.* Finally, the Court must consider the potential effect on the public interest (non-parties) in denying or granting the injunction. *Id.* The Court then weighs all of these factors, "sitting as would a chancellor in equity," when it decides whether to grant the injunction. *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992)).

## IV.   ARGUMENT

### a.   Plaintiff Satisfies the Standards for a Preliminary Injunction

Plaintiff's Motion for Entry of a Preliminary Injunction should be granted because Plaintiff has satisfied the necessary elements. A preliminary injunction may be issued upon

showing that: "(1) there is a reasonable likelihood that Plaintiff will succeed on the merits; (2) Plaintiff will suffer irreparable injury if the order is not granted because there is no adequate remedy at law; (3) the balance of hardships tips in Plaintiffs' favor; and (4) the public interest will not be disserved by the injunction." *Columbia Pictures Indus., Inc. v. Jasso*, 927 F. Supp. 1075, 1076 (N.D. Ill. 1996).

### i. Plaintiff Is Likely to Succeed on Its Trademark Infringement and Counterfeiting Claims

A preliminary injunction should be entered against the Defendants because Plaintiff is likely to succeed on its trademark infringement and counterfeiting claims. Defendants are liable for trademark infringement and counterfeiting under the Lanham Act if they, "without the consent of the registrant, uses in commerce any reproduction, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods … which such use[s] is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). To prove a *prima facie* case of infringement, a plaintiff must show (1) its mark is distinctive enough to be worthy of protection; (2) Defendants are not authorized to use the trademark; and (3) Defendant's use of the trademark causes a likelihood of confusion as to the origin or sponsorship of Defendant's products. *See Neopost Industrie B.V. v. PFE Int'l Inc.,* 403 F. Supp. 2d 669, 684 (N.D. Ill. 2005). Plaintiff satisfies all three requirements of the Lanham Act to successfully bring a trademark infringement and counterfeiting claim.

As to the first element, Plaintiff's trademarks are registered with the U. S. Patent and Trademark Office on the Supplemental Register. The Defendants used the "MILWAUKEE TOOL" design mark by slavishly copying Plaintiff's unique battery design and made infringing sales causing consumer confusion and lead them to believe that the products being sold by Defendants are made by or endorsed by Plaintiff. Specifically, Trademark Registration Nos. 5,645,535; 5,645,536; 5,645,537; 5,735,629; 5,735,630; 5,735,631; 5,735,632 and 5,735,633

relate to the three-dimensional configuration of a battery with a triangular-shaped button on each side of the battery in conjunction with a tab that are at issue in Defendants' Response. (*See* Group Exhibit A – Trademark Registrations). Both the triangular-shaped button and the tab are red in MILWAUKEE TOOL Products and Defendants' Products.

Defendants' infringement can be confirmed through a side-by-side comparison of Defendants' products and the registered marks of Plaintiff. (*See* Group Exhibit B – Evidence of Infringement and Exhibit – C Side-by-Side Comparison). Defendants not only copy the triangular-shaped button and tab, but also market and sell black batteries with red triangular-shaped buttons and red tabs. The overall appearance of Defendants' products is substantially similar to the products protected by MILWAUKEE TOOL's design marks.

The color photographs of Exhibit C show an authentic battery pack made by MILWAUKEE TOOL (on the left) and a counterfeit battery pack sold by Defendant Nos. 48 "sunmily", 122 "APTOOLER", 163 "HiTooler", 178 "LiBatter" and 185 "Mrupoo Brand" (on the right). Each of these Defendants sell products that look like the counterfeit product on the right. The images are strikingly similar and would easily confuse a consumer into purchasing the lower cost counterfeit product believing it to be a genuine MILWAUKEE TOOL Product. Defendants also use the registered MILWAUKEE and M18 marks in their promotional materials.

In addition to the Declaration of Jay Paragoso, additional evidence uncovered during discovery and testing by an independent laboratory will undoubtedly demonstrate that promotional materials for knockoff products, like Defendants' imitation battery packs, routinely trick consumers (including tradesmen and homeowners) who are often disappointed by the inferior quality in terms of performance and dependability by using terms like "Milwaukee M18 battery replacement" and "can power over 100 different Milwaukee cordless tools". Counterfeit

battery packs for power tools routinely present a host of troublesome issues including lower battery life, longer charging times and poor connect ability to the power tool, both from a mechanical and electrical standpoint, all of which can reflect poorly on MILWAUKEE TOOL and its solid reputation in the industry.

At an absolute minimum, Defendants have provided a false sense of origin and a misleading representation of fact as to the origin and sponsorship of their counterfeit products as alleged in Count II of the Complaint.

Plaintiff satisfies the second element because Plaintiff has not licensed or authorized Defendants to use the MILWAUKEE TOOL marks, nor are Defendants authorized retailers of genuine MILWAUKEE TOOL Products. *Id.* at ¶ 11. Plaintiff's marks have been continuously used and never abandoned. (*See* Exhibit D – Declaration of Jay Harvey Paragoso, ¶ 7).

With regard to the third factor, the Seventh Circuit has enumerated seven factors to determine whether there is a likelihood of confusion: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of the defendants to palm off their products as that of another. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d, 456, 461-462 (7th Cir. 2000).

In this case, MILWAUKEE TOOL satisfies all of the elements of the likelihood of confusion test. All five Defendants copy the MILWAUKEE TOOL design marks in the design of their products. All of the Trademark Registrations in Exhibit A relate to a triangular-shaped button. Specifically, Registration Nos. 5,645,535; 5,645,536 and 5,645,537 relate to a triangular-shaped button and tab and the '537 mark relates to a triangular-shaped button and tab along with a battery. (*See* Group Exhibit A).

5

Since all of the Defendants use the same design in the marketing and sale of their products, the first and second likelihood of confusion factors are satisfied by Plaintiff.

Plaintiff also satisfies the third factor because Plaintiff sells authentic lithium-ion batteries online. As demonstrated in Group Exhibit B, Defendants are also selling unlicensed products online through their e-commerce stores on Amazon. Since both parties are selling identical products with identical markings to the same consumers, the third confusion factor weighs in favor of Plaintiff.

Plaintiff satisfies the fourth factor because consumers purchasing replacement batteries for MILWAUKEE TOOL Products is not restricted to a specialized group of consumers. Rather, the consumer base are a diverse group of people. "[W]hen a buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class." *Trans Union LLC v. Credit Research, Inc.,* 142 F. Supp. 2d 1029, 1043 (N.D. Ill. 2001). As such, consumers for the MILWAUKEE TOOL brand are likely to be confused, so this factor favors Plaintiff.

Due to their long-standing use and wide acceptance by the public, Plaintiff's marks have become famous and associated with high quality MILWAUKEE TOOL Products. For over 90 years, MILWAUKEE TOOL has led the industry in developing innovative solutions that deliver increased productivity and unmatched durability for professional construction and home users. (*See* Exhibit D - ¶ 4). MILWAUKEE TOOL is the official source of MILWAUKEE TOOL Products and the marks signify to consumers that the products come from Plaintiff. *Id.* Thus, given the long history and well-known name, the fifth factor, the strength of the marks, also weighs heavily in favor of Plaintiff.

As for the sixth factor, Plaintiff does not need to prove likelihood of confusion with evidence of actual confusion; instead, it merely needs to show *some* evidence of potential

confusion. *See Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1363 (7th Cir.1995). In the present case, actual confusion can be inferred because Defendants are selling unlicensed MILWAUKEE TOOL Products in connection with the MILWAUKEE TOOL design marks. Because the goods are identical and have the same uses, consumers are likely to be confused and believe that Defendants' products are genuine MILWAUKEE TOOL Products or are sponsored or endorsed by Plaintiff. As such, Plaintiff satisfies the sixth factor in the likelihood of confusion test.

Regarding the seventh and final factor, Defendants are intentionally using the MILWAUKEE TOOL design marks to confuse and deceive the consuming public into thinking that Defendants' unlicensed products are manufactured by or are sponsored by MILWAUKEE TOOL. Defendants purposefully attempt to benefit and trade off MILWAUKEE TOOL's goodwill and reputation. Therefore, the final factor regarding Defendants' intent is satisfied by Plaintiff.

In sum, each of the seven likelihood of confusion factors are satisfied by Plaintiff, and, as a result, Plaintiff has proved that it has a reasonable likelihood of success on the merits for its trademark infringement and counterfeiting claim.

### ii. Nominative Fair Use is Not a Recognized Defense in this Jurisdiction

Defendants erroneously claim that the use of the MILWAUKEE TOOL marks constitutes 'nominative fair use' because Defendants had no other manner in which to identify their products, they minimally used Plaintiff's marks and their use of Plaintiff's marks does not suggest sponsorship or endorsement by the trademark holder. Defendants' arguments fail because the Seventh Circuit does not recognize 'nominative fair use' as a defense to trademark infringement.

Courts in this jurisdiction have declined to follow the 9th Circuit with regards to nominative fair use as a defense for trademark infringement. As stated in *Slep-Tone Entm't Corp. v. Coyne*, 41 F.Supp.3d 707, 717 (N.D. Ill. 2014) (J. Feinerman), the Seventh Circuit has not addressed the nominative fair use defense.  In fact, "it does not appear that any circuit has joined the Ninth Circuit's recognition of the nominative fair use defense and the Supreme Court has declined to address the issue" citing *KP Permanent Make-Up, Inc*., 543 U.S. at 115, n. 3, 125 S.Ct. 542, and "the Third and Sixth Circuits have rejected the defense, see *Century 21 Real Estate Corp. v. Lendingtree, Inc.*,425 F.3d 211, 220-21 (3d Cir. 2005); *PACCAR Inc. v. TeleScan Technologies, L.L.C*., 319 F.3d 243, 256 (6th Cir. 2003)."

As noted by Judge Der-Yeghiayan, the Seventh Circuit has indicated that issues regarding the use of a mark involve questions of fact beyond the pleadings.  *Americash Loans, LLC v. AO Ventures, LLC*, No. 08 C 5147, 2009 WL 743010 at *__ (N.D. Ill. Mar. 19, 2009) (J. Der-Yeghiayan) citing *Packman v. Chicago Tribune Co*., 267 F.3d 628, 637 (7th Cir. 2001) (stating that "the determination that a defendant's use was a non-trademark use in good faith, and the finding that consumers are not likely to be confused about the origin of a defendant's products are questions of fact").  Therefore, it is premature to address the fair use defense at this stage of the case.

However, even if this Court were to entertain Defendants' arguments, the 'nominative fair use' defense still fails because Defendants' use of the MILWAUKEE TOOL design marks is likely to confuse consumers to believe that their products are associated with or sponsored by MILWAUKEE TOOL.

### iii.    Defendants' "Fair Use" or "Good Faith" Defenses Fail

Defendants erroneously claim that use of the MILWAUKEE TOOL marks are protected

by "fair use" because Defendants used the word mark "MILWAUKEE" to describe their products and their use was allegedly in good faith.

In addition to Defendants' use of the "MILWAUKEE" word mark, Defendants unauthorized use of Plaintiff's design marks of its batteries and the resulting infringing sales which lead to consumer confusion is also at issue. Plaintiff's trademarked design marks relate to the three-dimensional battery with a triangular-shaped buttons and tabs on each side. (*See* Group Exhibit A). Both the triangular-shaped button and the tab are red in MILWAUKEE TOOL Products and Defendants' Products.

Defendants' use of Plaintiff's design marks was not in good faith because the use is likely to confuse the public as to the source of origin of the products being sold. "[T]he inquiry into the defendant's good faith concerns the question whether the user of a mark intended to create consumer confusion as to source or sponsorship." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 401 (2d Cir. 2009). When analyzing whether the Defendants' have caused confusion in the marketplace, "confusion" means whether "consumers [have been] misled into believing that the two [products] came from the same source" *Id.* at 400.

In the present case, Defendants' use of Plaintiff's design marks has led to, or is likely to lead the public to believe the products were either manufactured or sponsored by MILWAUKEE TOOL. Plaintiff is irreparably harmed by the unauthorized use of the MILWAUKEE TOOL marks because Defendants take away Plaintiff's ability to control the nature and quality of the products produced by Plaintiff. (Exhibit D, ¶ 19).

In a side-by-side comparison of Defendants' products and Plaintiff's, Defendants not only infringe Plaintiff's design marks, but also copy the colors of the triangular button, tab and battery body in an attempt to make their products nearly indistinguishable. (*See* Exhibit C). As a

result, Defendants products cause consumer confusion in the marketplace, which weakens Plaintiff's brand recognition and reputation. Exhibit D, ¶ 20. Counterfeit products, such as lithium-ion batteries, coming from China, can present safety hazards and are not subject to the same testing standards as genuine or licensed MILWAUKEE TOOL Products. *Id.* Consumers attributing these inferior quality products to Plaintiff result in increased skepticism and hesitance by consumers to purchase genuine MILWAUKEE TOOL Products in the future, resulting in a loss of sales and undermining Plaintiff's reputation and goodwill. *Id.*

Defendants' use Plaintiff's design marks to capitalize off of Plaintiff's goodwill and reputation to sell their products in the marketplace. As such, a preliminary injunction is necessary to prevent Defendants from further harming Plaintiff's reputation and consumer's safety.

### iv.    Plaintiff May Enforce Marks Listed on the Supplemental Register

Defendants' implication that the MILWAUKEE TOOL design marks listed on the Supplemental Register are less enforceable is without merit and ignores established precedent. "Registration of a mark on the supplemental register shall not constitute an admission that the mark has not acquired distinctiveness." (15 U.S.C. § 1095). "[A] party suing under § 32(1) for infringement of a mark registered on the Supplemental Register must establish secondary meaning, as well as a likelihood of confusion." *Eldon Indus., Inc. v. Rubbermaid, Inc.,* 735 F. Supp. 786, 814 (N.D. Ill. 1990). Plaintiff demonstrates that its design marks have established secondary meaning as well as a likelihood of confusion.

"'[S]econdary meaning' is acquired when 'in the minds of the public, the primary significance of a product feature … is to identify the source of the product rather than the product itself." *Thomas Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 291 (7th Cir. 1998). For

10

over 90 years, MILWAUKEE TOOL has led the industry in developing innovative solutions that deliver increased productivity and unmatched durability for professional construction and home users. Exhibit D, ⁋ 4. MILWAUKEE TOOL has expended substantial time, money and other resources in developing, advertising and otherwise promoting the MILWAUKEE TOOL Trademarks. *Id.* at ⁋ 8. As a result, products associated with the MILWAUKEE TOOL Trademarks are recognized and exclusively associated by consumers, the public and the trade as products sourced from MILWAUKEE TOOL. *Id.*

Plaintiff also establishes secondary meaning of its design marks as provided by the Lanham Act and the Trademark Manual of Examining Procedure (TMEP) through Plaintiff's exclusive and continuous use of its mark for well over the required five-year period. "The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the *five years before* the date on which the claim of distinctiveness is made." 15 U.S.C. §1052(f) (Emphasis added.)

The first use of the design marks in commerce occurred on September 6, 2016. (*See* Exhibit E –Reg. No. 5,735,633). A trademark application was filed on April 20, 2017, resulting with the registration of the mark on the Supplemental Register on April 23, 2019. *Id.* The trademark registration record demonstrates that Plaintiff's triangular-shaped buttons and button housing have been in continuous and substantially exclusive use in commerce for more than ten years, during which time the trade dress was shown on packaging, in marketing materials, in advertisements, and in diverse other ways. (*See* Exhibit F – Fry Decl. at ¶¶1, 3 and 6). Such long and continuous use of the mark infers that consumers recognize the mark and MILWAUKEE TOOL as the source of the mark. This inference is supported by the commercial success that

11

MILWAUKEE TOOL lithium-ion batteries bearing the mark have enjoyed.  In the six years between 2011 and 2017, sales of stand-alone lithium-ion batteries bearing the trade dress have exceeded $250 million.  *Id.* at ¶4.  Moreover, Plaintiff has spent millions of dollars marketing its batteries that feature the triangular-shaped buttons. *Id.* at ¶¶ 1 and 5.

In light of such use and resulting consumer acceptance as reflected by $250 million in sales over a six-year period, as well as the at least seven continuous and uninterrupted years of exclusive use which have passed since the mark was first used in commerce, Plaintiff has adequately demonstrated that its marks have acquired distinctiveness. *See* TMEP § 1212.06.  As a result, Plaintiff is entitled to a presumption of secondary meaning.

Plaintiff also demonstrates that there is a likelihood of confusion between the products sold by Defendants' and those sold by Plaintiff.

> "A number of factors must be examined when determining if a likelihood of confusion exists between the trade dresses of two products. These include: 1) the similarity of the trade dresses; 2) the area and manner of concurrent use; 3) the degree of care likely to be used by consumers; the strength of plaintiff's trade dress; 5) actual confusion; and 6) intent of the defendant to pass off its product as that of the plaintiff. When considering whether there is a likelihood of confusion, none of these factors considered alone is dispositive, and the weight to be accorded each varies from case to case." *Thomas Betts* at 296.

In regard to the first element, a side-by-side comparison of Defendants' products with MILWAUKEE TOOL's products (Exhibit C), demonstrates that the products are nearly indistinguishable to the average consumer. The lithium-ion batteries offered for sale by the Defendants include a black battery with a triangular-shaped red button on each side of the battery in conjunction with a red tab, which are described in MILWAUKEE TOOL's marks. *See* Exhibit C. The overall appearance of Defendants' products is substantially similar to the products manufactured and sold by MILWAUKEE TOOL.

12

Consumers who purchase both genuine MILWAUKEE TOOL brand battery packs and consumers who purchase counterfeit battery packs like those sold by Defendants use those products for the same purpose, which satisfies the second element of the consumer confusion test. The average consumer is unable to tell the difference between genuine and illegitimate battery packs through a visual inspection of an image on a website, which satisfies the third element.

As set forth above, Plaintiff's marks are strong distinguishable marks, which satisfies the fourth element of the consumer confusion test.

Actual confusion by consumers is significant. Defendants' sales of infringing products are significant. Defendant No. 48 "sunmily" sold 848 products for $60,843.03. *See* Exhibit G – Declaration of Luis Figueroa, ¶ 4. Defendant No. 122 "APTOOLER" sold 614 products for $81,309.53. *Id.* at ¶ 5. Defendant No 163 "HiTooler" sold 254 products for $16,455.83. *Id.* at ¶ 6. Defendant No 178 "LiBatter" sold 255 products for $30,996.67. *Id.* at ¶ 7. Defendant No. 185 "Mrupoo Brand" sold 695 products for $42,062.63. *Id.* at ¶ 8. Given the voluminous sales history of Defendants, Plaintiff satisfies the actual confusion prong of the consumer confusion test.

In regard to the final element, given the nearly identical product designs of Defendants' products, Defendants' intent was to pass off their products as those of the Plaintiff, thus satisfying the sixth and final prong of the likelihood of confusion test.

The success of the MILWAUKEE TOOL brand has resulted in its significant counterfeiting. Exhibit D, ¶ 8. The sale of counterfeit MILWAUKEE TOOL Products using the MILWAUKEE TOOL Trademarks clearly causes consumer confusion, which weakens MILWAUKEE TOOL's brand recognition and reputation. *Id.* at ¶ 20. Consumers who mistakenly believe that the Counterfeit MILWAUKEE TOOL Products that have purchased

originated from MILWAUKEE TOOL will come to believe that MILWAUKEE TOOL offers low-quality products. *Id.* Inferior quality products will result in increased skepticism and hesitance in consumers presented with genuine MILWAUKEE TOOL Products, resulting in a loss or undermining of MILWAUKEE TOOL's reputation and goodwill. *Id.*

MILWAUKEE TOOL is a household name known for the durability and reliability of its products. MILWAUKEE TOOL's well-known products and success in the marketplace have resulted in MILWAUKEE TOOL acquiring the secondary meaning required to afford its brand trademark protection. Defendants' sale of nearly identical products has resulted in a likelihood of confusion.

Plaintiff has established secondary meaning as well as a likelihood of confusion, which has resulted in Plaintiff successfully enforcing the MILWAUKEE TOOL design marks and defeating Defendants' claims of lack of enforcement.

### v. Defendants' Defense of Functionality Fails

Defendants erroneously claim that even if this Court determines that Plaintiff's design marks have established secondary meaning, they are not protectible because the trade dress design mark is functional.

In Section D of Defendants' Response in Opposition to Plaintiff's Motion for Entry of a Preliminary Injunction, Defendants assert for the first time that Plaintiff cannot show a likelihood of success on the merits because the trade dress design mark is "functional". However, Defendants failed to plead "functionality" as an affirmative defense in their Answer. [Dkt. No. 53]. In *Chartwell Studio, Inc. v. Team Impressions, Inc.,* No. 19-cv-6944, 2023 WL 1992180, at *8 (N.D. Ill. Feb. 14, 2023) (Rowland, J.), a functionality defense raised by the defense in its opening motion rather than its answer was deemed an affirmative defense waived by the

defendants. "[W]hile the burden of proving distinctiveness is of course on the plaintiff, some courts, including our own, hold that functionality is an affirmative defense and so the burden of proof rests on the defendant." *Chartwell Studio, Inc. v. Team Impressions, Inc.,* No. 19-CV-06944, 2023 WL 1992180, at *8 (N.D. Ill. Feb. 14, 2023) (J. Rowland). As a result, Defendants have waived the defense of functionality and any argument that currently raises this defense should be stricken by the Court.

However, even if this Court does not strike Defendants' 'functionality' defense as improperly raised, this defense still fails. The doctrine of functionality states that "a configuration of an article cannot receive trademark registration if its purpose is to contribute functional advantages to the article or if the configuration results from functional considerations." *Thomas Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 288 (7th Cir. 1998). "'A utility patent must be examined in detail to determine whether or not the disclosed configuration is really primarily functional or just incidentally appears in the disclosure of a patent. *Id.* at 300.

To support their 'functionality defense' Defendants erroneously claim that the issuance of a utility patent precludes Plaintiff from obtaining trademark protection. (Defendants' Response, pg. 13). "Unlike state laws prohibiting unfair competition, federal trademark protection cannot be pre-empted by patent law. *Thomas Betts* at 285. The *Thomas Betts* Court determined that "…the district court's legal conclusion that the disclosure of a feature in an expired patent (whether as the 'best mode' or otherwise) automatically precludes trademark protection is erroneous." *Id.* at 290. "… the concept of functionality is intended to screen out from the protection of trademark law certain design features even if they have become so far identified with the manufacturer of a particular brand that consumers may be confused about the origin of the good if another producer is allowed to adopt the feature." *W.T. Rogers Co. v. Keene,* 778

F.2d 334, 338 (7th Cir. 1985). "The purpose is to reduce the cost of information to consumers by making it easy for them to identify the products or producers with which they have had either good experiences, so that they want to keep buying the product (or buying from the producer), or bad experiences, so that they want to avoid the product or the producer in the future." *Id.* at 338–39. "In determining whether a given trade dress is functional, the court must consider the design as a whole, rather than its individual features." *Eldon Indus., Inc. v. Rubbermaid, Inc.,* 735 F. Supp. 786, 821 (N.D. Ill. 1990).

The '576 publication and '776 patent cited by Defendants as precluding trademark protection fail to reference the red triangular button or red latch that is a distinctive part of the MILWAUKEE TOOL design marks. The red interlocking button and latch that is a prominent part of the MILWAUKEE TOOL design marks is described in the '576 publication as "comprising a housing" with "a first latch member extending through the housing; a second latch member extending through the housing, the first and second latch members operable to secure the battery pack to the power tool." (U.S. Patent Publication No. US 2013/0330576). Similarly, the red triangular button and latch of the MILWAUKEE TOOL design marks are described in the '776 patent as "a battery connection port positioned as the second end of the housing and adapted to receive the battery pack; wherein the battery connection port defines a removal axis for the battery pack." (U.S. Patent No. 8,852,776). As is demonstrated by the claims in both the '576 Publication and '776 Patent for the battery packs, no mention is made of the red triangular button or red latch in the abstract, description or claims of either patent. Defendants' analysis of the '576 Publication and '776 Patent is unsupported by any competent expert opinion. Rather, Defendants are simply speculating as to the functionality of the trademark registration as is demonstrated by the lack of evidence in their baseless claims.

"In this Circuit, a 'feature is functional if it is one that is costly to design around or to do without, rather than one that is costly to have.'" *Thomas Betts* at 297. Defendants could have easily chosen numerous other designs as well as other colors to use in the design of their lithium-ion batteries. Defendants could have selected any other colors besides red for the buttons and tab, any color other than black for the battery, a myriad of shapes of the battery or of the buttons and tab but chose not to because it would have resulted in fewer sales of their products.

The market is full of alternative designs, and more can easily be imagined. Despite the fact that MILWAUKEE TOOL has a strong brand name and their products are very appealing to the general public, that does not make its design functional. Defendants have provided no basis for concluding that it could not compete with another design, and therefore, Defendants' functionality defense fails.

### vi. There Is No Adequate Remedy at Law and Plaintiff Will Suffer Irreparable Harm in the Absence of Preliminary Relief

The Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." *Re/Max N. Cent., Inc. v. Cook,* 272 F.3d 424, 432 (7th Cir. 2001) (citing *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 469 (7th Cir. 2000)); *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1114 (7th Cir. 1997); *Wesley–Jessen Division of Schering Corp. v. Bausch & Lomb Inc.,* 698 F.2d 862, 867 (7th Cir.1983). Irreparable injury "almost inevitably follows" when there is a high probability of confusion because such injury "may not be fully compensable in damages." *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.,* 560 F.2d 1325, 1332 (7th Cir. 1977). "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846

17

F.2d 1079, 1092 (7th Cir. 1988); *see also 4 Callmann on Unfair Competition, Trademark and Monopolies* § 88.3(b) at 205 (3d ed. 1970). As such, monetary damages are likely to be inadequate compensation for such harm. *Ideal Indus., Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1026 (7th Cir. 1979).

The harm caused by the infringement of the marks of MILWAUKEE TOOL is equally damaging.  The infringement deprives Plaintiff of the ability to control the creative content protected by the trademark, it devalues the MILWAUKEE TOOL brand by associating it with inferior quality goods and it undermines the value of the trademarks by creating the impression that infringement may be undertaken with impunity which threatens Plaintiff's ability to develop additional markets for his products. (*See* Exhibit D, ℙ 20, 21).  These are recognized irreparable harms for which monetary compensation is inadequate.  *See MGM Studios, Inc. v. Grokster, Ltd.,* 518 F.Supp. 2d 1197, 1219 (C.D. Cal. 2007). Defendants' unauthorized use of Plaintiff's marks has and continues to irreparably harm Plaintiff through diminished goodwill and brand confidence, damage to Plaintiff's reputation, loss of exclusivity, and loss of future sales. (*See* Exhibit D, ¶¶ 18-21).

The extent of the harm to Plaintiff's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are both irreparable and incalculable, thus warranting an immediate halt to Defendant's infringing activities through injunctive relief. *See Promatek Industries, Ltd. v. Equitrac Corp.,* 300 F.3d 808, 813 (7th Cir. 2002) (Finding that damage to plaintiff's goodwill was irreparable harm for which plaintiff had no adequate remedy at law); *Gateway Eastern Railway Co. v. Terminal Railroad Assoc. of St. Louis,* 35 F.3d 1134, 1140 (7th Cir. 1994) ("[S]howing injury to goodwill can constitute irreparable harm that is not

compensable by an award of money damages."). Plaintiff will suffer immediate and irreparable injury, loss or damage if a preliminary injunction is not entered against Defendants.

### vii. The Balancing of Harms Tips in Plaintiff's Favor

As noted above, if the Court is satisfied that Plaintiff has demonstrated (1) a likelihood of success on the merits, (2) no adequate remedy at law, and (3) the threat of irreparable harm if preliminary relief is not granted, then it must next consider the harm that Defendants will suffer if preliminary relief is granted, balancing such harm against the irreparable harm Plaintiff will suffer if relief is denied. *Ty, Inc.*, 237 F.3d at 895.

"When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." *Krause Int'l Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587-88 (D.D.C. 1994). This is because "[o]ne who adopts the marks of another for similar goods acts at his own peril since he has no claim to the profits or advantages thereby derived." *Burger King Corp. v. Majeed,* 805 F. Supp. 994, 1006 (S.D. Fla. 1992). Therefore, the balance of harms "cannot favor a defendant whose injury results from the knowing infringement of the plaintiff's trademark." *Malarkey-Taylor Assocs., Inc. v. Cellular Telecomms. Indus. Ass'n,* 929 F. Supp. 473, 478 (D.D.C. 1996).

Thus, the balance of equities tips decisively in Plaintiff's favor and equity requires that Defendants be ordered to cease their unlawful conduct.

### viii. Issuance of the Injunction is in the Public Interest

An injunction in these circumstances is in the public interest because it will prevent consumer confusion and stop Defendants from violating federal trademark law. The public is currently under the false impression that Defendants are operating their internet stores with

Plaintiff's approval and endorsement. An injunction serves the public interest in this case "because enforcement of the trademark laws prevents consumer confusion." *Eli Lilly*, 233 F.3d at 469.

Federal courts have long held that "the trademark laws ... are concerned not alone with the protection of a property right existing in an individual, but also with the protection of the public from fraud and deceit." *Stahly, Inc. v. M.H. Jacobs Co.,* 183 F.2d 914, 917 (7th Cir. 1950). The public interest is further served by protecting "the synonymous right of a trademark owner to control his product's reputation." *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976).

In this case, the injury to the public is significant, and the injunctive relief that Plaintiff seeks is specifically intended to remedy that injury by dispelling the public confusion created by Defendants' actions. The public has the right not to be confused and defrauded as to the source of the goods and services offered by Defendants, or as to the identity of the owner of trademarks used in connection with those goods and services. Unless Defendants' unauthorized use Plaintiff's marks are enjoined, the public will continue to be confused and misled by Defendants' conduct. For these reasons, the public interest is best served by entering a preliminary injunction against the Defendants.

## V. CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court enter a preliminary injunction against Defendant Nos. 48 "sunmily", 122 "APTOOLER", 163 "HiTooler", 178 "LiBatter" and 185 "Mrupoo Brand". The evidence and arguments presented by Plaintiff at this early stage of the case are sufficient to demonstrate irreparable harm and justify entry of the Preliminary Injunction.

Respectfully submitted,

Dated: September 15, 2023

By:    <u>s/Michael A. Hierl</u>
        Michael A. Hierl (Bar No. 3128021)
        William B. Kalbac (Bar No. 6301771)
        Hughes Socol Piers Resnick & Dym, Ltd.
        Three First National Plaza
        70 W. Madison Street, Suite 4000
        Chicago, Illinois 60602
        (312) 580-0100 Telephone
        <u>mhierl@hsplegal.com</u>
        <u>wkalbac@hsplegal.com</u>
        Attorneys for Plaintiff
        MILWAUKEE ELECTRIC TOOL
        CORPORATION

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court, served by publication and email to the Defendants identified in Schedule A and served on all counsel of record and interested parties via the CM/ECF system on September 15, 2023.

/s/ *Michael A. Hierl*